The opinion of the court was delivered by
Mark, J.
The city of New Orleans was incorporated by act of the Territorial Legislature, approved seventeenth February, 1805, with the powers usually conferred on municipal corporations, including that of raising money for municipal purposes “ by tax upon real and personal estate within the city.” P. 4A.
Under this charter, and such amendments as the Legislature saw fit-to make, from time to time, the municipal government was administered until 1836, when, by act approved eighth March, the city was divided into three municipalities, each having a separate .government for local purposes, with all the powers, within their respective limits, which had been vested in the undivided city, except that there was one Mayor for the whole city, and a General Council to decide upon masters of general interest. P. 28.
This act required the then existing debt of the city to'be, paid by the three municipalities, the quota of each to be apportioned on the basis of the amount of taxes and revenues accruing to each:átoreáted a sinking fund for the purpose of paying this debt and interest, section 15; and provided that, in case of reunion, “the debt of each municipality shall be paid by the inhabitants thereof.” Sec. 26.
A supplementary act, approved eleventh March, 1836, declared, more specifically, that, if the law establishing the three municipalities should, by any future Legislature, be repealed, or so amended as to unite them into one corporation, “ all the debts created by each of the-said municipalities shall first be fully paid and satisfied by each municipality separately.” Sec. 2, p. 38.
The contingency thus provided for was realized in 1852:. the three municipalities were reunited by act approved twenty-third February,, p. 42. The Second Municipality became the First District; the First Municipality, the Second District; the Third Municipality, the Third *3 District; and by act approved the same day, p. 55, the city of Lafayette was annexed to, and incorporated with the city of New Orleans as the Fourth District.
By subsequent legislation all that part of the parish of Orleans situate on the right bank of the Mississippi was annexed as the Fifth District: Jefferson City, as the Sixth: 1870, p. 30; and the city of Carroll-ton, as the Seventh District of New Orleans, 1874, p, 119. In each case the city of New Orleans became liable for and assumed the debts of the corporations annexed, as it had done with respect to the three municipalities and Lafayette.
During the sixteen years of separation the three municipalities contracted debts far beyond their resources; and they became greatly embarrassed, and finally insolvent. The Legislature, from time to time adopted measures for their relief: 1839, p. 94:1847, p. 140: 1850, p. 169; and an act was passed in 1850 for the government and administration of the affairs of the city of New Orleans, “in case the three municipalities should be reunited.” P. 156. Nothing was accomplished under this act; and, obvious as the necessity was for a reunion, there were serious difficulties in devising a satisfactory plan, and in adjusting and carrying out the requisite details. The “ inhabitants ” were not able to pay the debts of each municipality, respectively, as required by section 26 of the act of 1836; and the “municipalities” were not able to "comply with the condition precedent imposed by section 3, of the supplementary act, which required that all the debts created by each municipality should first be fully paid and satisfied by each. The debts of the several municipalities were unequal in amount, and not proportionate either to the population or to the respective values of the taxable property in each; and the constitution of 1845 required that taxation should be equal and uniform throughout the State.
The Legislature of 1852 grappled with these difficulties. By the two acts of twenty-third February, No. 71, section 37, No. 72, section 5, the entire indebtedness of the municipalities and of Lafayette, including the quota of the old city debt apportioned to each municipality in accordance with section 15 of the act of eighth March, 1836, and the separate debt subsequently created by each, was consolidated and assumed by the city of New Orleans; and bonds of the city were issued for the aggregate amount, having not more than forty years to run. The old city debt was divided between the three municipalities in proportion to the value of the real estate within the limits of each, as fixed by the State assessment roll of 1851; and this quota, added to the separate debt created by each municipality, constituted the entire debt of each.
To meet the annual interest, and to provide a sinking fund for the purchase and final payment of these bonds, an annual special tax of *4 $650,000 was to be levied on the real estate and slaves in the three municipalities and Layayette, the rate per cent in each to be in proportion to the indebtedness of each. The act also required the Common Council, in the month of January, of each year, to pass an ordinance to raise this sum, 'to be called the consolidated loan tax; and it declared null and void all ordinances, resolutions, or other acts passed by the Council after the first of January, in each year, “ unless the ordinance imposing the consolidated loan tax shall have been previously passed.” The city of New Orleans was forbidden to issue any obligation or evidence of debt except the consolidated bonds; or to contract any loan, unless the same be authorized by a vote of the majority of the qualified voters of the city: and it was also declared that no ordinance creating a debt or loan should be valid unless for a single object or work, distinctly specified therein, and unless such ordinance should provide ways and means for the punctual payment of the current interest, during the whole time for which such debt or loan should be contracted, and for the full and punctual discharge, at maturity, of the capital borrowed or debt incurred; and such ordinance was made irrepealable until the capital borrowed or debt contracted, and the interest, should be fully paid and discharged.
It would be difficult to find municipal obligations better secured than these consolidated bonds apparently were. They were recognized as valid by the Legislature in numerous acts, from 1852 to 1874; and they enjoyed high credit in the markets of Europe and America.. Under the free banking law of 1855 they were received by the State as security for the redemption of the circulation of the banks; and trust funds to a large amount were invested in them. The interest was paid punctually; and some five millions of the bonds have been paid, or purchased and' retired, leaving some four millions outstanding.
The Legislature, on the twelfth March, 1852, passed an act, No. 175, authorizing parishes and municipal corporations to subscribe to the stock of corporations undertaking works of public improvement, to be paid by a tax on landed estate. This act did not authorize the issue of bonds in payment of the stock; and it provided that the stock should belong to the taxpayers, in proportion to the amount of the tax paid by each.
Stringent as the prohibitions of the consolidated act were, the City Council, in May, 1852, by two ordinances, subject to ratification by the qualified voters, took stock in the New Orleans, Jackson, and Great Northern Railroad, to the extent of $2,000,000, and in the New Orleans, Opelousas, and Great Western Railroad, to the extent of $1,500,000, payable in the bonds of the city, the interest to’be met by a special tax on real estate and slaves. The Legislature, in 1854, by acts 108 and 109, *5 required the Council to repeal these ordinances, no doubt because they ■were considered to be unlawful assumptions of power; but by the same acts it authorized the subscriptions, bonds, and special tax in accordance with the ordinance^ requiring the city to collect and pay the railroad tax for 1853; and by act No. 110, of the same year, the city was authorized to take stock in the Pontchartrain Railroad to the extent of $1,500,000, with the view of extension to Mobile, payable in bonds, the interest to be secured by tax on all the taxable property of the city. These three acts required ratification by the qualified voters.
By subsequent acts the city was authorized to issue bonds without the formality of popular ratification; so that the entire bonded and floating debt, which aggregated, on the thirty-first December, 1852, $8,736,238, amounted, on the thirty-first December, 1874, to $24,741,765.
The owners of real estate and slaves found this tax oppressive, and after submitting to it for four years, 1852 to 1855, inclusive, they memorialized the Legislature for relief. In 1856 the Legislature passed three acts for that purpose, Nos. 93,134,164. The first of these limited city taxation on movables, or personal property, and real estate and slaves, to one dollar and fifty cents on the hundred, provided that rate on real estate and slaves should suffice to raise the amount required to pay the interest on the city debt, together with the gradual reduction of the capital of the consolidated debt. This act prohibited the levy, by the City Council, of any tax, whether on movables or on real estate and slaves, which should not be equal and uniform within the limits of, or through the several districts of the city. Act No, 134 subjected to city taxation every species of property, real and personal, with certain specified exemptions; and act No. 164 amended the consolidation act, and enlarged the city charter embodying, substantially, the provisions of acts Nos. 93 and 134. Section 42 of this act required the Common Council to levy, annually, an equal and uniform tax on all property, real and personal; but this taxation was limited to one dollar and fifty cents on the hundred, including the consolidated loan tax and the special railroad tax, provided that rate should be sufficient to pay the interest on the consolidated debt and the railroad bonds issued by the city.
Since the passage of these acts taxation in New Orleans has been at a fixed rate per cent, on all taxable property, according to valuation; but the rate has been changed by the Legislature, as the exigencies of the city required. Out of the sum thus raised the amount required for the consolidated loan tax was set apart annually, and applied to the consolidated debt.
By act No. 5, extra session, 1870, the Legislature forbade the process of mandamus against any auditing or disbursing officer of the city, *6 to compel the issuing of any warrant for or to enforce the payment of any money claimed to be due by the city. This act required all actions for money claimed of the city to be instituted, in the ordinary form, against the city as a corporation. It prohibited the issuing of any execution or fieri facias to enforce any judgment against the city: it provided for the registry of such judgments by the auditing officer; and made-them payable, in. the order of theim.registry, either out cf money in the treasury or out of the next annual budget.
In 1874, by act No. 53, the Legislature postponed, until December, 1876, the levy and collection of any tax, by the city of New Orleans, for a sinking- fund, for the purchase of its bonds; but it expressly provided that “ this act shall in no wise be construed to hinder, delay, or affect the payment of the interest on the bonds of said city, as the same shall mature; and provided further, that the validity of the consolidated bonds of the city of New Orleans is hereby recognized in all its integrity, it being the object of this act to afford temporary relief to the taxpayers of New Orleans, in the embarrassed condition of affairs, and not to detract from or impair the rights of the holders of said bonds or others.” P. 92.
In 1876 an act was passed, No. 31, commonly known as the premium bond act, authorizing the city of New Orleans to fund its entire bonded debt. Section seven of this act prohibited, the levy of any city tax, either for 1876, or for any year thereafter, for the payment of other bonds, or interest on other than the premium bonds. All laws authorizing the City Council to levy any tax whatsoever for other bonds, or interest on other bonds, were repealed; and the courts of the State were declared incompetent to compel the officers of the city, by mandamus, to levy and collect any interest tax other than that provided for in the act.
The Southern Bank, holder of 613 of the consolidated bonds, formally demanded of the city, in December, 1876, and in December, 1877, compliance with the requirements of the consolidation act. The city having thus been put in default, this suit was brought against the Mayor and Administrators, to compel them, by mandamus, to levy and collect a special tax, by separate and distinct assessment, of $650,000, on the real estate subject to that tax, for each of the years 1874 to 1878, inclusive, less coupons paid in 1874 and 1875: and by injunction to prevent the levy, by the Mayor and Administrators, of any tax on the real estate within the city limits subject to taxation in favor of the consolidated loan.debt, under the act of 1852, without first having provided for that debt. The petition states at length and minutely the history of the consolidated debt and bonds, which we have endeavored to condense, and to connect with the legislation by which they may be affected; and *7 it charges that “ the city and the taxable real estate within its limits are liable for the payment of the matured coupons, and for the purchase of the bonds, to the extent of $650,000 per annum for the years 1874 to 1878, inclusive, less coupons paid in 1874 and 1875, the amount of which relator knows not.”
The petition also charges that the city is estopped from denying the validity of thfe bonds and coupons, and the obligation to levy the special tax under the provisions of section 37, of act 71 of 1852, by reason of the judgment of the circuit court of the United States in the case of Rosalie Maenhaut vs. the City of New Orleans, “ wherein the city denied liability for the debt and wherein the circuit court declared said section 37 to be a contract, binding on the city, the State, and the bondholders, and has ordered and compelled a distribution of taxes realized, and has reserved all the rights of complainants to a mandamus to compel the levy and collection and application of said special tax, at' a future time, to its legitimate objects.”
The mayor and administrators excepted to the jurisdiction of the court, setting- up and relying upon the acts of 1870 and 1876, already referred to.
They also excepted that no ministerial duty is imposed on them to levy or collect the tax sought to be enforced by mandamus ; on the contrary, they are forbidden by the act of 1876 to levy said tax for 1876, or any year thereafter: and that the act of 1874 suspended the levy of any tax for sinking fund, under act 71, of 1852, until December, 1876 ; and. that a tax was levied and collected to pay the interest on the consolidated bonds until 1876, when it was forbidden by act 31, of that year.
In their answer respondents repeat, substantially, the defenses set up by way of exception. They also plead that section 37, of the act of 1852 is unconstitutional and void, because the objects of that section are not expressed in the title, as required by the constitution of 1845, art. 118, which was in force at the date of the passage of that act.
They plead that the tax provided for in section 37, of the act of 1852, is violative of art. 127, of the constitution of 1845, and art. 123, of the constitution of 1852, because it is to be assessed on real property and slaves alone; and because the rate per cent of the tax, in each municipality, is to be in proportion to the indebtedness of each; and that all the subsequent acts referred to by relator as recognitions of the bonds and tax specified in section 37, of the act of 1852, are, upon the same grounds, wholly unconstitutional and void.
Weekerling and others, owners of real estate in the First, Fourth, and Sixth Districts, intervened, alleging that their property was not liable to the special tax imposed by the act of 1852 ; and that that act is violative of articles 118,127 of the constitution of 1845, and 115,123 of the *8 constitution of 1852. They joined respondents in opposing relator; and they alleged that an injunction will not lie on a petition in the form adapted to mandamus.
Thomas H. Hunt, the owner of premium bonds of the city, intervened, and set up the defenses plead by respondents. He opposed. the injunction prayed for, on the ground that, if granted, it would arrest the mayor and administrators in the performance of their proper legislative and executive functions, overthrow the city government, and result in anarchy.
He set out at some length the constitutional objections to the act of 1852, based upon the alleged defect in the title, and the want- of-equality and uniformity in the tax; and he specially objected to so-much of section 37 of the-act as restricts the legislative functions of future Legislatures, and the exercise of such legislative powers as may be conferred, from time, to time, by the Legislature, upon the mayor and council, as null and void, being beyond the power of the Legislature of 1852, or any other year.
Montgomery and others, taxpayers, intervened, admitting the validity of the bonds, and joining relator in his prayer for mandamus so far as it relates to the tax for 1878 and future years ; but they opposed and protested against it for previous years, on the ground that the imposition of taxes for such an amount would be ruinous, and would lead to bankruptcy.
Finally, the State of Louisiana intervened, claiming to be the owner of 213 of the consolidated bonds; and joining relator in his demand.
Respondents filed a supplemental answer, setting out more specifically the constitutional objections to the act of 1852; pointing out alleged defects in the title ; and exposing the inequality and want of uniformity in the special tax on real estate and slaves alone.
Relator objected to the filing of the interventions in opposition to its demand, on the grounds, that interventions are not allowed in mandamus proceedings of the character of the present one; and- that no party can be allowed to intervene unless he shows a direct personal interest which would be irreparably injured by the judgment apprehended., and unless such party could bring a direct action for the purpose of recovering the object of his intervention.
The form of action can not control the right to intervene. Whenever there is a suit, a plaintiff on the one side demanding, and a defendant on the other side resisting, a third person may, by timely application to the court, on proper showing,- be made a party. O. P. 389.
“ In order to be entitled to intervene it is enough to have an interest in the success of either of the parties, or an interest opposed to-both.” C. P. 390.
*9 The taxpayers, intervenors in this case, are very much interested in the success of respondents, and in opposing the demand of relator to have a large sum levied and collected as a tax on their property, as well as on that of others. The holder of the premium bonds is very much interested in opposing the mandamus and injunction which would interfere with, perhaps prevent, the levying of any tax to pay the accruing interest on his bonds.
There is no analogy between this case and that of Roudanez and others, 29 An. 271. In that case the Legislature having authorized the mayor and administrators of New Orleans to hold an election, for the purpose of taking the sense of the people as to the levy of a tax in aid of the Pacific Railroad, Roudanez'and others sought, by injunction, to prevent the holding of the election. We held that this could not be done ; that the Legislature had the right to submit such a question to the people, whenever it saw proper to do so ; that the tax had not yet been authorized ; and that plaintiffs had no interest and no right to prevent the holding of the election, the result of which might or might not be the consent of the people to the tax.
In this ease the direct object is to have a tax levied and collected at once. We think the taxpayers had the right to intervene and to be heard.
Relator also objected to the filing of the supplemental answer, on the grounds, that, if the first answer be true, the second could only be a reiteration of the first, and would, therefore, be irrelevant; or, if the second answer was different, from the first, it would change the issues, and, therefore, would be inadmissible.
The supplemental answer does not conflict with the original answer. It is an amplification of the original; it did not retard the trial; and it required no other or different proof than that which was required under the original. We think it was properly received.
The district court made the mandamus peremptory, but refused the injunction ; sustained the intervention of Montgomery and others, and of the State of Louisiana, in so far as they joined in the prayer of' relator for mandamus and injunction, and refused their prayer in other respects, and ordered the intervention of Weekerling and others to be stricken out, and that of Hunt to be dismissed as in case of nonsuit.
From this judgment Weekerling and others, the mayor and administrators, and Hunt appealed separately. Relator in answer to the appeal asks that the judgment be so amended as to grant the injunction as prayed for; and be affirmed in other respects.
The issues thus presented to us for solution are of the utmost gravity; and they have been argued With great ability by the distinguished counsel representing the several parties. A review of all the *10 authorities cited by them is not possible within the compass of a judicial decision, nor can we attempt a synopsis of the points presented and argued in a discussion which occupied five days.
Many of the matters discussed are of great public interest; but some of them we have no power to pass upon judicially on this appeal. No bonds ■ are'before us except the consolidated bonds. True, the holder of premium bonds intervened; but he does not seek to enforce his- bonds; nor does he ask for any judicial recognition of them. He states that he is the holder of these bonds merely as inducement, for the purpose of showing his interest and his right to intervene. The only decree.which we have jurisdiction to render, under the pleadings, Is such as may be proper, in our judgment, either affirming or reversing the judgment appealed from. We shall endeavor, therefore, to limit our inquiry to the points and questions tending to the determination of' the.matters passed upon by the district court: the right of the relator to the relief sought, by mandamus and injunction.
Before, proceeding further we think it proper to say that, in our opinion, the judgment of the circuit court of the United States, in Maenhaut and others vs. the city of New Orleans, is not res adjudicata; and that it does not operate as an estoppel, against the mayor and administrators, on any of the questions involved in this case. Money was collected by the city authorities for taxes, out of which a certain amount had been set apart, and deposited with the fiscal agent, to be applied to the- consolidated debt. The mayor and administrators undertook, in July, 1875, out of the whole of the taxes so collected, to pay fifty per cent, on account of the interest due on the entire bonded debt of the city, if the holders of the matured coupons would accept the arrangement. Maenhaut and others, holders of consolidated bonds, brought suit to prevent by injunction the proposed distribution of the tax money ; and they also demanded the specific enforcement of the Act of 1852.
The court decided that complainants were entitled to distribution, ratably, “ of the money actually on deposit to the credit of the consolidated coupons overdue and held by them.” To that extent the preliminary injunction was maintained ; and in all other respects the bill was dismissed, “ reserving the right of the complainants to urge at law the claims by them herein set up.”
Obviously, when the taxpayers had paid the money, and the city authorities had set apart and deposited a certain amount to the credit of outstanding matured obligations, it was no longer in the power of the mayor and administrators, to change, its destination, or to apply the money, “ actually on deposit to the credit of the consolidated coupons,” to any other purpose.
We may add that in a later case, Vignier vs. the Mayor and Ad *11 ministrators, in the circuit court of the United States, the District Judge sitting, the judgment in Maenhaut’s case was held not to conclude the city; and the mandamus prayed for by the holder of consolidated bonds, to compel the levy and collection of the special tax, was refused.
From the history which we have given of the consolidated bonds, it is manifest that they were issued for a good and meritorious consideration. ' They represented what remained unpaid of the old city debt, contracted prior to the separation in 1836, and the debts of the several municipalities contracted during the separation.
The consolidation of the city of New Orléans made it necessary for the city to assume these debts, because, by the consolidation, the city took and became the owner and administrator of all the means and resources of the municipalities for paying debts, and the municipalities ceased to exist as separate bodies. Assuming these debts, it was necessary for the city to put them in a shape that would be acceptable to the creditors, and would give the city, the new debtor, time to provide the means of paying them. Bonds payable at a distant day, bearing interest, constituted the only form of obligation that would meet the emergency; and they are the most usual and convenient form of municipal obligations.
The validity of these bonds is questioned on the single ground that section 37, of the act of 1852, under which they were issued, is violative of art. 118 of the constitution of 1845, which declared that, “ every law enacted by the Legislature shall embrace but one object, and that shall be expressed in the title.”
The title is “ An act to consolidate the city of New Orleans, and provide for the government and administration of its affairs.” The single object of the act was to consolidate the city of New Orleans : to bring back its dissevered members, and to put an end to their separate existence by uniting them under one government. The consolidation required some provision for the government and administration of the affairs of the new corporation thus created; and all the details and particulars in the body of the act, germane to the one object, the single purpose contemplated by the Legislature, without which that purpose could not have been accomplished, are sufficiently indicated and expressed in the title. The immediate cause of the consolidation was the utter inability of the municipalities to pay the debts for which they were separately bound, and to substitute the city, in all things pertaining to municipal government, for the municipalities. The issuing of these bonds was an act of administration of the affairs of the city, devolved upon it by the consolidation, and necessarily pertaining to the government of the city.
The act of 1852 was a waiver of the condition precedent established' *12 by section 3, of the supplementary act of 1836; and a repeal of that section. But the framer of section 37 was evidently controlled by the idea that the requirement of section 26, of the act of March 8, 1836, must be enforced ; and the debts of each municipality must be paid by “ the inhabitants thereof.” The original partition of the old city debt, under section 15, of the act of 1836, on the basis of the amount of taxes and other revenues accruing to each municipality, was apparently equitable, and we are not informed of the motives for the departure from that apportionment, and the new apportionment, in section 37, on the basis of the' value of real estate within the- limits of each municipality, as fixed by the State assessment roll of 1851.
Having thus fixed the quota of each municipality, by an invariable and arbitrary standard, and established the portion of the aggregated debt to be paid by each by adding to this quota the debt created by each, section 37 required the inhabitants of each municipality to pay their respective portions of the consolidated debt by an annual tax on. the real estate and slaves owned by them, without respect to their value, the per centage in each municipality being in proportion to the amount of the indebtedness of each.
We have no means of ascertaining the relative value? of real estate and slaves, or of other taxable property, in the several municipalities, in 1851, nor subsequently. In the nature of things the taxes imposed by the act of 1852 could not have beeD equal and uniform. During the forty years of the running of the consolidated bonds many of the slaves would die, and any and all of them might have been removed beyond the limits of the city at any time, so that they would not have been within the reach of city taxation : and great changes would necessarily take place in the actual and relative values of real estate in different parts of the city, while the portion of the debt to be paid by the inhabitants of each subdivision was irrevocably fixed. The assessment rolls from 1870 to 1877, inclusive, were offered in evidence ; and they show how unequally and oppressively the tax as fixed by section 37 would operate now. The real estate in the First District, in 1870, was valued at $50,986,125 : personal property at $16,148,140 : in 1877, real estate $36,-611,165 ; personal property at $17,187,620. In the Second District, in 1870, real estate $29,870,975: personal property $5,118,102 : in 1877, real estate, $21,578,925, personal property $2,792,295. In the Third District, in 1870, real estate $10,693,723; personal property $809,005. In 1877, real estate $9,497,765 ; personal property, $639,282. In the Fourth District, in 1870, real estate $14,683,995; personal property $909,416 : in 1877, real estate $12,374,530 ; personal property $800,828.
The practical operation of this mode of taxation shows how great the disparity was during the four years, from 1852 to 1855, inclusive, *13 after which it was abandoned. The aggregate of the per centage levied on real estate and slaves for these four years, for all purposes, was : In the First District, 858J : in the Second, 809£ : in the Third, 1071J ; and in the Fourth, 765J : while all other taxable property in the city paid only 295, for all purposes, in these four years.
The constitution of 1845, art. 127, which corresponds with art. 123 of the constitution of 1852, and art. 118 of the existing constitution, is as follows:
" Taxation shall be equal and uniform throughout the State. After the year 1848 all property on which taxes may be levied, in this State, shall be taxed in proportion to its value, to be ascertained as directed by law. No one species of property shall be taxed higher than another species of property of equal value, on which taxes shall be levied.”
It would be a waste of words to attempt to show the manifest inequality and want of uniformity in the tax imposed by section 37 of the act of 1852. It was flagrantly in conflict with the constitution of 1845.
Counsel for relator urge that 'art. 127 of the constitution of 1845 was applicable only to taxation by the State, and not to municipal taxation : and' they rely on Second Municipality vs. Duncan, 2 An. 182: Cummings vs. Lafayette, 3 An. 674; and Buffington vs. Dinkgrave, 4 An. 548.
In Duncan’s case, the Second Municipality, on the 29th August, 1846, levied a tax of one per cent on all the real estate within its limits. Duncan opposed this tax as being unequal. The only proof seems to have been the admission that there was no special ordinance of the municipality assessing taxes on personal property. Under the constitution of 1812 it was held that the Legislature had power to select the objects of taxation ; and, that to be equal and uniform, the tax must be the same on the objects so selected.
Under the charter of 1805 the city of New Orleans had the power to tax real and personal estate; and this power belonged to the municipalities during their separation under the act of 1836. Jurisprudence had settled that it was not necessary for the city or the municipalities to exercise all the power thus conferred by taxing all property real and personal; and the tax in this case was equal and uniform on all the property selected, real estate.
The equality and uniformity thus understood had been observed in the tax in question ; and it will be borne in mind that the part of article 127 of the constitution of 1845, which forbids the taxing of one species of property higher than another species of property of equal value, was expressly postponed in its effect until after 1848. Chief Justice Eustis, who was the organ of the court, did say that this article of the consti *14 tution “ by its very terms, applies to State and not to municipal taxes. It provides for the equality and uniformity of taxation throughout the State.” 2 An. 183. But there was no occasion to say any such thing, for the reason that the tax in question was lawful under the constitution of 1812, and the city charter of 1805 ; and that part of the constitution of 1845 which might have made it unlawful did not take effect until a year after this decision was rendered, nearly two years after the tax was levied.
In Lafayette vs. Cummins, the suit was for license tax on defendant’s occupation. Judge Eustis, who was again the organ of the court, referring to Duncan’s case, 2 An., said that, after thorough argument, article 127 was held to be applicable to State, and not to municipal taxes. Surely there was no occasion for this dictum. The tax was levied on the occupation, under authority of an act of the Legislature ; and every person pursuing that occupation was subject to the same tax. There is no other mode of levying such a tax; and it was equal and uniform, strictly within the letter and spirit of article 127.
In Buffington vs. Dinkgrave the tax in question was a city license on the occupation. The inequality of the tax was urged, mainly on the ground that a part of the year had already expired when the plaintiff became subject to the tax. It did not appear that the tax was other than that imposed on all persons pursuing the same occupation: ahd no law required the city to fractionize the license tax. The coürt disposed of the objection by a simple reference to the cases of Duncan and Cummins. But hs the tax was equal and uniform, in that it was imposed alike on all persons pursuing the same occupation, it was not in conflict, but in strict accordance with article 127.
We can not assent to the proposition that article 127 of the constitution of 1845, and article 123 of the constitution of 1852, were not applicable to municipal taxation. The decision in Duncan’s case was rendered on the 15th February, 1847. The Legislature was then in session ; and it hastened to place the taxpayers of New Orleans under the aegis of this constitutional provision. By act approved -May 4,1847, No.'192, page 147, it was declared that “ taxation within each municipality shall be equal and uniform. After the year 1847, property on which taxes may be levied in each municipality shall be taxed in proportion to its value. No one species of property shall be taxed higher than another species of property of equal value, on which taxes shall be levied.”
We can not regard the words “ throughout the State,” as used in the first alinea of article 127, as limiting the operation of the great principle which it declares. On the contrary, they convey to our minds the idea that in no part of the State of Louisiana can taxes not equal and uniform be lawfully levied, whether by the State government or by *15 the municipal governments on which the Legislature has chosen to confer taxing power. The principle of equality and uniformity in taxation is inherent in, it underlies every system of government not despotic; and it acquires no additional force by the formulated expression of it in the organic law, which, in that respect, is simply declaratory.
The subsequent phraseology of article 127 seems to us to place the meaning beyond doubt. It relates to property on which taxes may be levied in this State. Taxes may be levied on property in this State for State purposes, for parochial purposes, for municipal purposes: and there is not one word in the article in question which limits its meaning to taxation by the State for State purposes, or indicates the intention of the Convention, while guarding the rights of the citizen against unequal and oppressive taxation by the State, to leave them at the mercy of police juries in the several parishes, and mayors and aldermen, or councils, in the numerous towns and cities of the State.
Certainly it would not be possible to establish an equal and uniform tax for every parish and town and city, because their exigencies and requirements and resources are different. What the constitution means, what the law of equality and uniformity requires is, that the tax, if levied by the State, must be at the same rate throughout the State, and upon the valuation of the property taxed. If levied for parochial purposes, all the property taxed in the parish must be at the same rate on valuation. If the tax be for municipal purposes, it must be at the same rate, on valuation, throughout the limits of the corporation. Any tax levied, in any part of the State, by any taxing power, which does not conform to this rule of equality and uniformity, so precisely formulated in article 127, is unconstitutional, ultra vires, and void.
We can not assent to the dictum in Duncan’s case for another reason : and that is, that, confessedly, after the year 1848, the Legislature had no power, under the constitution of 1845, to tax one species of property higher than another species of property taxed, of equal value; and the Legislature could not confer upon a municipal corporation, the mere creature of its will, any power which it could not exercise by direct legislation.
The profound respect which we entertain for the late Chief Justice Eustis, and the other eminent jurists who composed the Court over which he presided, -has imposed upon us the necessity of stating, at greater length than we should otherwise have done, our reasons for holding, in opposition to their opinion, that article 127 of the constitution did control municipal taxation, and that all taxing power throughout the State, in any and every part of the State, must be exercised in strict conformity to the principle of equality and uniformity, first formulated in that article, and preserved, substantially, in all the subsequent *16 constitutions. See Gilman vs. Sheboygan, 2 Black, 510; Talcott vs. Pine Grove, 19 Wallace, 675, and cases there cited from State courts.
If it be conceded, and we do not care to discuss that proposition now, that under the constitution of 1845, after the year 1848, the Legislature or a municipal corporation could select one species of property, and impose a tax upon that species of property alone, excluding any other species of property made taxable by law, it would not thence follow that the tax could be so levied on that species of property, whether by the State or by a municipal corporation, that the rate on valuation could be higher in one part of'the State, if taxed by the State, or in one part of the city, if taxed by a municipal corporation, than in any and every other part of the State or corporation. Our attention has not been called to any decision or dictum sanctioning any such manifest injustice. But this is precisely what the Legislature did, by section 37 of the act of 1852.' The boundary between the Second and Third Districts is Esplanade street. The owner of real estate and slaves on the up-town side of Esplanade paid per centages, for the four years ending in 1855, aggregating 809-J, while his neighbor on the opposite side of that street paid, in the same period, 1071J. Canal street separates the First and Second Districts. The proprietor on the upper side of Canal street paid 858J, while the owner of property on the lower side paid 809J. Felicity street is the dividing line between the First and Fourth Districts, and while the property on the lower side of that street paid 858£, that on the upper side paid 765J.
Such injustice was too glaring to escape the notice of the Legislature ; and the Acts of 1856 put an end to it by subjecting all taxable property in the city of New Orleans to the same rate per cent upon the same basis, valuation.
Counsel for relator insists that section 37, of the act of 1852, is a contract, binding on the State, the city, and the bondholders. Unquestionably there was a contract, and a very simple one, between the city and the bondholders. The city assumed the debts for which the several municipalities and Lafayette had been liable ; and it executed its bonds, bearing interest, payable semi-annually, for the amount. The city also undertook to raise the sum of $650,000 per annum to pay the accruing interest and to provide for the gradual extinction of the bonds. The bonds were the evidence of the contract: the contract was to pay the amount stipulated, principal and interest. That was the obligation of the contract; and that obligation is placed under the protection of the constitution of the United States, as well as of that of the State of Louisiana.
But was it a part of this contract that the city should issue no other bonds or evidences of debt, during the forty years of the running of *17 -these bonds ? We think not. So long as the city paid the interest punctually, it was no concern of these bondholders what amount of debt might be contracted toward other persons. Legislative power and the sovereignty of the State may be assimilated to paternal power, which ■can not be surrendered at will. The powers conferred on municipal corporations are subject, and must ever remain subject to legislative control ; and the Legislature of to-day can not impose restrictions on the powers of a municipal corporation which a future Legislature can not modify or abrogate, except where some vested right’might thereby be •divested, or the obligation of some contract be impaired. In Board of Liquidators vs. McComb, the Supreme Court of the United States •said:
“We are not prepared to say that the Legislature of a State can bind itself, without the aid of a constitutional provision, not to create a further debt, or not to issue any more bonds. Such an engagement could hardly be enforced against an individual; and when made on the part of a State, it involves, if binding, a surrender of a prerogative which might seriously affect the public safety. The right to procure the necessary means of carrying on the government by taxation and loans is essential to the political independence of every commonwealth.” 2 Otto, 535.
These views are applicable to a municipal corporation. The Legislature of 1852 had the power to forbid the city to issue any obligation or •evidence of debt; and the incapacity would continue until it was removed 'by the Legislature. The Legislature might refuse to confer on a muni-cipal corporation the power to issue any bond, for any purpose; but it •could not bind any future Legislature not to confer that power. We find, in point of fact, that the Legislature, two years after, in 1854, did authorize the city of New Orleans to issue its bonds for five millions, to pay for stock in railroads; and to provide for the interest on three millions ■and a half of that amount by special tax on real estate and slaves. This may not have been wise: it certainly proved most disastrous to the •city; but the Legislature clearly had the power to remove the restrictions imposed by the act of 1852.
It did not concern the bondholders that the old city debt should be apportioned to the inhabitants of the several municipalities; because, as to them the separate indebtedness of the municipalities had been novated ■and discharged by the assumption and bonds of the city. It was no part of the contract with them that the quota of the old city debt to be paid by the inhabitants of each municipality should be fixed on the basis of the value of the real estate in each in 1851; and that this quota •should be added to the separate debt created by each in order to ascertain and establish the amount of the entire debt of each. These details •did not concern the bondholders: they were simply the result of the *18 design of the Legislature to make the inhabitants of each municipality pay the debts of each, as provided by section 26, of the act of 1836. It was no concern of the bondholders that the annual sum to meet the interest, and finally to pay the bonds, should be levied on real estate and slaves alone. Indeed, so far as their interests were concerned, it would seem that they would naturally have preferred to have the entire taxable property within the city limits subjected to the payment of their bonds. Why these objects were selected we do not know; but it may be that it was because real estate and slaves constituted the greater part of the taxable value, and were sufficient; and that the city desired to reserve the entire taxable capacity of every other species of property for other municipal purposes. All these details and arrangements were purely domestic; they concerned no others than the inhabitants themselves; and their whole scope and design was to adjust, among the inhabitants, their respective contributive shares to the payment of what had become the common debt of the whole city.
In, thq Sheboygan,case, an act of 1854 provided that a tax to meet certain railroad bpnds .should be levied on all the taxable property in the city. -In.1857 the Legislature thought proper to restrict this tax to real estate exclusively. The suit was by an owner of real estate taxed under the act of 1857, whose property had been sold for the tax. The court said-the act of 1854 was not a contract. “The imposition, modification, and removal of taxes, and the exemption of property from such burdens is an ordinary exercise of the power of State sovereignty. .There was no pledge, express or implied, that this power should not thereafter be exercised.” 2 Black, 513.
It was not a bondholder who complained in that case; but the principle is applicable to the complaint by a bondholder, unless it were shown that the property exclusively subjected was not Sufficient to pay the debt. Certainly it applies with much more force to a case, such as that which we are dealing with, in which there has been not a withdrawal of property originally subjected to taxation for the payment of the bonds, but the subjection of the entire taxable property of the debtor, in lieu of the special objects originally subjected.
The Legislature of Louisiana, in 1856, chose, in the ordinary exercise of the power of State sovereignty, which it has no power to surrender, to require all property to be taxed at the same rate, on the same basis, valuation. This 'effectually repealed the special tax on real estate and slaves exclusively; but it did not impair the obligation of the contract with the bondholders, nor did it diminish either the sum to be raised annually for the consolidated debt, nor the resources from which that sum was to be raised. In Layton’s case, 12 An. 515, this court held the act of 1856 to be in strict conformity to the constitution. It equalized *19 taxation; and relieved the inhabitants of the burden of paying, in each district, the debt of that district, and imposed it equally- on the whoje city, and its entire taxable property.
The bondholders have no right to interfere with the administration of the city government, by requiring a certain order in the business of the legislative department of that government, and claiming the nullity of its proceedings if not in conformity with that order; nor can they, nor any other creditors of the city, compel the city government to levy a special tax on one species of property exclusively, for their benefit. If these bondholders ever had any right to demand the levy of a special tax, it was a tax on real estate and slaves. But the five millions of dollars worth of slaves once subject to taxation in New Orleans have ceased to be property; and the burdens of the owners of real estate would be thereby greatly increased; if the whole tax should now be levied on their property alone. Such a change was not contemplated by any of the contracting parties; and it would be equitable and just to relieve the owners of real estate of this additional burden, by subjecting to the payment of these bonds all the taxable property within the.city limits, if that had not already been done by the acts of 1856. , , ,
We think that section 37, of the act of 1852, in so far as it author-; ized the special tax on real estate and slaves, was violative of art. 127, of the constitution of 1845, then in force. That it was repealed to that extent by the acts of 1856: that the acts of 1856, in that respect, are in strict accordance with article 127 of the constitution of 1845, and the corresponding article, 123, of the constitution of 1852; and that they in no manner impair ,the obligation of any contract with the bondholders* or with any other person whomsoever. The. levy of the special tax on real estate, as prayed for by relator, is legally impossible. ■
It is urged by counsel for relator that the opinion of the court in the eases of Duncan, Cummins, and Buffington interpreted the constitution of 1845; and that the bondholders acquired their rights with refer-; enee to this interpretation; that art. 127 was not applicable to municipal taxation. The answer.is, if this be conceded, that, in Duncan’s case the court decided nothing more than that the Legislature, or its creatur.e, a municipal corporation, had the power to select, a single object of taxation, real estate. In that case the object so selected was taxed equally at a uniform rate, one per cent, on the assessed value: and in the othen cases the taxes were equal and uniform, being a fixed sum on the trade or occupation in each case. No court in Louisiana, so far as we.know, has decided that when the' object of taxation has been selected it could be taxed at one rate, on a given basis, in one part of the State or bity* and at a different rate, or upon a different basis, in another part' of the; city or State; If the constitution of 1845 did. not forbid such inequality; *20 in municipal taxation, it was forbidden by the fundamental, inherent principle that taxation must be equal and uniform on the property, taxed.
If the whole of section 37, of the act of 1852, entered into and constituted the contract between the bondholders and the city, we incline to the opinion that the whole contract would be void, because of the manifest inequality and want of uniformity in the special tax. But we think the contract with the bondholders was that of which the bonds are the evidence, the lawful obligation of the city to pay the principal and interest as stipulated.
Relator maintains that at the time these bonds were issued the holders were entitled by law to compel payment by mandamus: that the tight to use this remedy entered into and formed part of the contract; and that they can not be deprived of this right by subsequent legislation.
Laws relating to the forms of judicial proceedings are remedial; and the form, in any case, must depend on the law in force at the time the proceeding is instituted, without regard to the law at the time the facts on which it is based occurred. If before the final- decision a new law should intervene and change the form, the form originally resorted to can no- longer be pursued, unless the new law expressly declares that the •pre-existing form shall be followed in the cases then pending. No individual can claim a vested right in the remedial process by which his demand might have been enforced at the time it accrued, when the Legislature has chosen, subsequently, to abolish that process. See Ludeling vs. His Creditors, 4 Martin N. S. 603; Scott vs. Duke, 3 An. 253, and authorities there cited. What the suitor has a right to claim is the use of such remedy as may be adequate to his demand, not that he shall be permitted to enforce that demand in any special form, or by any specific process. These views are fully sustained by the decision of the Supreme Court of the United States in Tennessee vs. Sneed, 6 Otto, and by many decisions of that court, and of the State courts cited at pages 73, 74. The proceeding in Tennessee vs. Sneed by mandamus was brought after that form of proceeding, in such cases, had been prohibited by the State Legislature. The Supreme Court of Tennessee refused the writ; and the Supreme Court of the United States, on writ of error, affirmed that judgment.
By the Code of Practice, article 746, final judgments rendered in other States, or foreign countries, might b.e enforced summarily by executory process, just as mortgages may be enforced now, without previous citation of the debtor. The Legislature chose, by act of 1846, p. 166, to repeal this provision of the law. Several cases in which this form had been resorted to were pending, some on appeal, at the date of *21 the passage of the act of 1846. This court held, in every case, that this change, pending the proceedings, even on appeal, deprived the courts of the power to proceed further. The repeal of the former law did not divest vested rights, nor did it deprive the judgment creditors of adequate remedy. It prohibited the summary process allowed by the former law; and remitted them to the ordinary form of suit by petition and citation. See Scott vs. Duke, 3 An. 253: Kilgore vs. Planters’ Bank, same, vol. 693: Commercial Bank vs. Markham, same, 698; Featherstonh vs. Compton, 8 An. 285.
The law to-day authorizes the mortgagee to have the mortgaged property seized and sold by executory process, summarily, without previous citation of the mortgagor. The remedy is expeditious; and, no. doubt, the right to enforce mortgages summarily makes that form of security more desirable, more valuable. The Legislature may repeal this law at any time, and remit the mortgagee to the ordinary form of proceeding, by petition, citation, judgment, and execution. Could any mortgageee pretend that this would be unlawful interference with his vested rights; or that the obligation of the contract would be thereby impaired ?
In Strauss vs. Brown, 30 An. 79, a creditor sought to enforce his demand against the city of New Orleans by mandamus to compel thei auditing officer to issue to him a warrant for the amount. We held that act No. 5, of 1870, extra session, prohibited the remedy resorted to:. that it compelled the creditors of the city to proceed in the ordinary form ; and, after having obtained judgment, that it might be registered in the office of the Administrator of Public Accounts, and paid out of the next annual budget, as required by the act.
We also decided, in that case, that the act of 1870 does not deprive the creditors of the city of adequate remedy, that is, such remedy as creditors in general have against their debtors, by suit in the ordinary form. Having obtained judgment, the creditor must proceed to have it paid in the manner required by the act, and not otherwise. The right of relator, Strauss, accrued in 1876, under the dominion of the act of, 1870; and we did not And it necessary to express any opinion as to the. effect of the act with respect to pre-existing contracts and obligations.
In the Carondelet Canal Company vs. the Mayor and Administrators, the relator had obtained judgment against the city in the ordinary form, and had caused it to be registered in the office of the Administrator of Public Accounts. The mayor and administrators had failed to; provide for the payment in the next annual budget after the registry,; as required by the act. • ; •;
We held that the duty of the mayor and administrators was- plain,' and the right of relator absolute ; and that there was no means or pro *22 cess by which this right could be enforced, otherwise than by mandamus. We accordingly made the mandamus peremptory, requiring the mayor and administrators to provide for the payment of this judgment out of the next annual budget. 30 An. 129.
The present case differs from that of Strauss vs. Brown in that the right of relator accrued long before the passage of the act of 1870; and it differs from the Carondelet Canal case in that relator has not obtained judgment against the city, nor attempted to enforce its rights in the mode prescribed by that act. We think this act pertains entirely to the remedy: that it is within the constitutional power of the Legislature ; and that it is obligatory alike on creditors of the city, whether their rights accrued prior to 1870 or subsequently.
If the seventh section of the act No. 31, of 1876, admits of no other interpretation than that it deprives any class of creditors of the city of New Orleans of the right to enforce.their demands by judicial process, we think it would be in excess of legislative power, and void. But if it is susceptible of the construction that it forbids creditors, bondholders, and others, to proceed directly by mandamus to compel the levy and collection of a tax to pay the amounts due them, and requires all such creditors to proceed under the act No. 5, of 1870, we think it would not be violative of any legal or constitutional right.
If the seventh section of the act should be held to be violative of the constitution, it would not thence follow that the entire act is .unconstitutional. We do not find it necessary to pass upon this act, because the views which we have already expressed suffice to dispose of this ease; and we prefer to reserve any expression of opinion as to the validity of the act, in whole or in part, until the question shall be presented to us in such shape and between such parties as will give us jurisdiction. Without reference to this act, the relator is not entitled to the relief Which he seeks ; and that is the only matter to be determined on this appeal.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that the demand of relator be rejected and dismissed, with costs in both courts.